IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action |
| | ) | No. 24-cr-235 |
| Plaintiff, | ) | |
| | ) | SENTENCING |
| vs. | ) | |
| | ) | Washington, DC |
| Gustav Seestedt, | ) | June 30, 2026 |
| | ) | Time: 9:57 a.m. |
| Defendant. | ) | |

TRANSCRIPT OF SENTENCING
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For Plaintiff: Karen Shinskie
U.S. Attorney's Office
601 D Street NW
Washington, DC 20530
(202) 252-7688
Email: Karen.shinskie@usdoj.gov

For Defendant: Michael Lawlor
Brennan McKenna & Lawlor
6305 Ivy Lane, Suite 700
Greenbelt, MD 20770
(301) 474-0044
Email: Mlawlor@brennanmckenna.c

Court Reporter: Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * * * * * *P R O C E E D I N G S* * * * * * *

THE COURTROOM DEPUTY: We are on the record with criminal case 24-235, United States of America versus Gustav Seestedt. For probation we have Katie Freeman and Empress Hargis.

Counsel, starting with the government, please approach and state your appearance for the record.

MS. SHINSKIE: Good morning, Your Honor. Karen Shinskie for the United States.

THE COURT: Good morning.

MR. LAWLOR: Good morning, Your Honor. Michael Lawlor for Mr. Seestedt.

THE COURT: All right. I note that Mr. Seestedt is present. And we're here this morning for his sentencing. He pled guilty to Count 1 of the superseding indictment, sexual exploitation of a child, in violation of 18 U.S. Code § 2251(a), which carries a 15-year mandatory minimum sentence and a maximum sentence of 30 years.

He also pled guilty to Count 5, possession of child pornography, in violation of 18 U.S. Code § 2252(a)(4)(B), which carries a maximum sentence of 20 years and no mandatory minimum. He pled guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), and that means that if I accept the plea, I also accept the agreed sentence as well and the defendant will be sentenced, as the parties agreed, to 15 years

of incarceration, followed by a period of supervised release for the rest of his life.

To make that determination, I have to consider all the statutory factors that I would consider when I was sentencing anyone who's been pled guilty or been convicted at trial, including, but not limited to, the U.S. Sentencing Guidelines to determine what I think the appropriate sentence would be. So, we need to start there.

Mr. Lawlor, the final revised presentence report was filed in this case on June 12th, 2026. Have both and you your client had an opportunity to review it?

MR. LAWLOR: Yes, Your Honor.

THE COURT: And I don't believe there's any information that's been excluded from it or factual disputes to be resolved in connection with it, is that correct?

MR. LAWLOR: It is.

THE COURT: All right. So, hearing no objection, then I'm going to accept the presentence report as undisputed and part of my findings of fact at sentencing.

I have received additional materials concerning the defendant, including the government's memorandum in aid of sentencing, victim impact statements, and some restitution-related documents related to Count 2, the possession of child pornography count; the motion filed on behalf of Minor Victim 1, the victim of Count 1, asking me to

reject the plea agreement on the grounds that the agreed sentence is not sufficient, the very compelling and powerful victim impact statement written and filed by Minor Victim 1. I'm sure it was very difficult to write and I appreciate the fact that it was submitted.

I received the government's opposition to the motion that I disregard the plea agreement and the defendant's opposition to that motion, as well as the defendant's memorandum in aid of sentencing. And I also received a number of attachments in connection with the defendant's memorandum, including letters, from Jessica Seestedt, the defendant's wife; Peter Conner and Andrew Seestedt Conner, his brothers; Jane Seestedt Biel, his sister; Casey Burdette, a friend and sister-in-law; Shirley Burdette, his mother-in-law; Sheila Mooney, a family friend; Ellen Gagne, a family friend; Christine Ghillani, a family friend; Nan Roman, a family friend; and Shelley Page, his aunt. I also received a psychological evaluation prepared by Lisa Hunt at the Center for Clinical and Forensic Services. I have read and I've considered all of the materials.

I note that the legal submission on behalf of the minor victim appears to somewhat misapprehend the nature of today's exercise. It informs me that she objects to the binding nature of the agreement and its restrictions on my discretion, and briefed that issue at some length, and notes

that she wants to be heard on what sentence I impose once I reject the plea agreement.

But, judges don't, and I won't, decide first whether I want to be bound by the plea agreement and then hear from the parties and the victim about what the sentence should be. There's nothing inherently untoward about a plea pursuant to that rule, as the submission intimates, and it doesn't alter the fact that, putting aside mandatory minimums, the responsibility for determining what the sentence is, consistent with § 3553, lies squarely with me.

I simply can't determine whether I want to be bound by the plea agreement until I've calculated the guidelines, heard from the parties, fully considered what the sentence should be. And so it's absolutely essential to that exercise what I understand fully what the impact of the conduct the defendant engaged in 20 years ago with Minor Victim 1, beginning when she was 14 years old, the effects on her then and what effects continue today. So I am grateful to have her impact statement, written in her words, although I'm not sure why I had to set a date for counsel to submit it or what you were waiting for. But I have it and I've read it.

It's also essential that I understand the facts of what took place from her perspective and how they might vary from the defendant's characterization of what happened. Her submission and the victim impact statement I received will

receive my most serious consideration when I factor in the nature and circumstances of the offense and the other statutory considerations, such as the need for just punishment, the need to reflect the seriousness of the offense, et cetera.

But I agree with defense counsel, though, that the legal submissions somewhat overstepped when counsel for the victim also went on to address the enhancements and the sentence for Count 2, and essentially took on the role of an extra prosecutor and one who, I don't think, had necessarily internalized the teachings of *Booker*, *Gall*, *Kimbrough*, and *Rita*, in which the Supreme Court made it crystal clear how the advisory guidelines fit into the task before the Court.

So I'm going to do right now what I do in every sentencing, because in a criminal case there's a statute that tells me how I'm supposed to go about making this decision, and it's 18 U.S. Code § 3553, and it lists a number of important factors that I have to consider, which I will consider it. But it also tells me that the first thing I have to do is calculate what the U.S. Sentencing Guidelines would recommend as a sentence in your case.

The purpose of the guidelines is it sets out sort of default sentencing ranges for each offense, and then those can go up or down based on aggravating factors and mitigating factors. And the purpose is to advise at what the commission would recommend as a sentencing range in any particular case.

So I'm going to begin with that calculation, but I note that it's only the first part of the analysis, and I also note that it's not in dispute.

The first thing we have to talk about is because Counts 1 and Count 5 involve different victims and separate sets of harms, under § 3D1.2 of the guidelines, they're not grouped as one count for purposes of the guidelines. That means we have to calculate the guideline level for Count 1 and then we have to calculate the guideline level for Count 5. We figure out which one is higher, we adjust for the presence and the existence of the other counts in accordance with § 3D1.4.

And from this point on, for the next few minutes, the sentencing is going to sound more like an exercise in algebra or math than an exercise in law, but this is how the guidelines work and this is what I have to do. And I'm going to do it in this case and I do it in every case.

Count 1, as I said earlier, he is convicted of sexual exploitation of a child, in violation of 18 U.S. Code § 2251. § 2G2.1(a) says we start for that count at a level 32. And then there are characteristics that take the guideline level up under § 2G2.1(b)(1)(B). Because this offense involved a minor who was at least 12, but not over 16, you add two levels. Under § 2G2.1(b)(2)(A), because it involved the commission of a sexual act -- and here there were many over a long period of time -- you add two levels.

Under § 2G2.1(b)(6)(B), the use of a computer to persuade, induce, or entice a minor to engage in sexually explicit conduct including, as here, to solicit the transmission of sexually explicit images, you add two more levels.

So now we're at an offense level of 38. And if that was the only count and we gave the defendant credit for acceptance of responsibility, it would go down to a level 35 and the sentencing commission would recommend a sentence of 168 to 210 months, or 14 to 17 1/2 years just for that offense. And so that's an important marker here. And this is the count with the mandatory minimum of 15 years, which falls squarely in the middle of that range.

But it's not the only count we have to think about. There's also Count 5. He pled guilty to possession of child pornography, in violation of 18 U.S. Code § 2252(a)(4)(B). This is an offense for which Congress did not impose any mandatory minimum. It starts out, under the guidelines, at a base offense level, under § 2G2.2(a)(1), of 18. But then, under § 2G2.2(b)(2), because the pornography involved prepubescent minors, you add two levels.

Under § 2G2.2(b)(3)(F), because this offense involved the distribution of these images, you add two levels. Under § 2G2.2(b)(4)(A) and (B), because the images involved sadistic or masochistic conduct or other depictions of violence, or

sexual abuse of an infant or toddler, you add four levels.

Under § 2G2.2(b)(6), because a computer was involved in the transmission of these images, you add two levels. And under § 2G2.2(b)(7)(D), given that there were more than 600 images, we add five levels. In many cases I object to this as a policy matter because each video counts as 75 images and so you can get to 600 with just eight videos. But here, we in fact have a situation where the defendant had more than 1600 video files, and the number of more than 600 was appropriate.

So when you add all those enhancements up, we get to an adjusted offense level for this offense alone of 33. So the process of adjusting for the two counts takes the higher one, the higher offense level under Count 1, and that counts as one unit. The offense level of Count 5 is five to eight levels less than that, and that counts for half a unit. When you have a total of one and a half units under § 3D1.4, you increase the higher offense level by one more level, and that brings us to a level 39.

And so by that point the guidelines had taken the existence of the two separate crimes into account. But, it's a sex offense so the guidelines aren't done. He's not entitled to the two-level reduction for having a lack of criminal history points. And under § 4B1.5(b)(1), two offenses constitute a pattern of an activity involving prohibited sexual conduct, so we're going to treat him as a repeat and dangerous

offender and take it up to level 44. So the guidelines catapult you ahead for that reason. In the case of someone convicted of a racketeering offense, it's only a pattern if the two offenses were within ten years of each other. But here, it's anytime at all.

So now we're up at a level 44 for the two offenses. But the defendant has accepted his responsibility. He has entered a plea of guilty, he's admitted his responsibility and he gets credit for that and there's a reduction of three levels. And that brings us, under the guidelines, to a total offense level of 41. His criminal history category is Roman Numeral I, the lowest category there is. And, therefore, the Sentencing Commission and the chart that they have that tracks the offense levels against the criminal history scores recommends a guideline range of 324 to 405 months, which is 27 to 33 and 3/4 years. And as the presentence report points out, the statutory maximum for Count 1 alone is 360 months, but for Count 5 it's only 240 months. So you couldn't get a sentence within that guideline range for that offense alone.

So that's what the guidelines would recommend, that's our starting point. No one has filed any motions for downward departure, and we know that the parties are agreed as to what my recommended sentence should be, which is lower than what the guidelines would recommend.

So at this point, now we're going to get into the

part of the sentencing analysis that considers all the factors that I'm supposed to consider. And I want to start by saying that I have read Minor Victim 1's submission and her letter, but if she wishes to address the Court -- and that's entirely up to her, whether she does or she doesn't, because I have read it -- this would be her opportunity to come forward and do so.

You can have your lawyer stand with you, but you're going to be the one who is speaking.

THE VICTIM: Right here?

THE COURT: Come and speak into this microphone, please. I understand that it's not an easy thing to do.

THE VICTIM: Thank you. Your Honor, thank you for your time and consideration of my statement. My name is Claire Lanman, and until now I've only been identified as Minor Victim 1 or the defendant's teenage ex-girlfriend in court records in this case.

For the past 21 months I have existed as a silent party to this case, patiently waiting for my opportunity to be reasonably heard. I have spent many months ruminating over my past experiences with the defendant, the crimes he committed against me, the impact they've had on my life, and how I could convey that impact for the consideration of this Court at sentencing.

I never wanted to be Minor Victim 1. While I spent nearly 20 years of my life in denial of my past experiences, I

am now painfully aware that I'm a victim of the defendant; that I wasn't the first, and I wouldn't be the last. In light of his more recent offenses, I felt compelled to come forward and provide the government with a more accurate picture of the defendant. I had hoped that the totality of the defendant's crimes, his predatory characteristics, and his propensity for harm would be considered by the Court in determining the appropriate sentence.

I'm greatly concerned that the plea agreement reached between the government and defense counsel does not sufficiently serve justice for the crimes he has committed. I hope that the Court will reject the proposed plea agreement as too restrictive and the parties will either reach a new plea deal that allows Your Honor to decide the appropriate sentence based on all of the information available, or the case goes to trial.

Exactly two years ago, on June 30th, 2024, I received a text message from my sister-in-law, informing me of the defendant's arrest. What began as an ordinary Sunday morning for me, standing in my living room with my best friend, became the date that permanently altered the course of my life. As I read the details of the defendant's crime, the video he shared with an undercover officer depicting the forcible rape of a toddler victim, I experienced the first and only panic attack of my life thus far.

My hands began to shake and I dropped my phone. And as my body felt limp and I struggled to breathe, my best friend moved me to the couch and instructed me to put my head between my legs and breathe deeply. In between breaths the only thing I could say was, "Oh, my God, I was a child. I was just a kid."

I was not shocked by what the defendant did because a part of me always knew he was capable of doing something like this. I've spent most of my days of my life largely disassociated from my body, but in that moment my body was overriding this disassociation, signaling alarms to the trauma that I had been carrying this whole time. In that moment, I knew I would be forced to face the reality of my past traumas, the reality I've spent my entire adult life running from.

In the fall of 2003 I entered the 7th grade in a school that ran from 7 to 12, where the defendant was a high school senior. Before he graduated, the defendant was one of the most popular guys in school. He was handsome, charming, and funny. He was a big personality that was making people laugh and drawing attention to himself. He was flirtatious and had a reputation for dating many girls, often younger.

I, on the other hand, was coming from a home where I felt misunderstood and emotionally neglected while dealing with the normal stressors of girlhood and puberty. It is because of these issues that I wanted to attend this school where my older

brother attended for his special education needs. I had hoped to receive individualized care as my brother. The irony is that my attendance at that school led me to cross paths with the defendant, and the issues that brought me there left me so vulnerable to his predation.

I did not interact with the defendant much in school, although I was aware of him and his reputation. The defendant would later tell me it was during this time that he first developed an interest in me, when I was only 12 years old. In my first year of school I learned that the defendant had sexual contact with Minor Victim 2, a girl in my grade who was 13 years old at the time.

I saw that Minor Victim 2 was largely blamed and shamed for what happened to her. There was an understanding that the defendant was a man with very little impulse control for his sexual urges and it was the responsibility for young girls to avoid indulging him. Over the course of my 8th grade year I became best friends with Minor Victim-2.

In the summer of 2005 Minor Victim-2 introduced me to the defendant. I had just turned 14 years old, and the defendant was 19 years old. The details of this early interactions with the defendant are laid out in the statement of offense.

That first night in the defendant's home was the first time I smoked marijuana, the first time I had been

kissed, and the first time I had sexual interactions of any kind. While those experiences were unsettling and strange to me, my lack of sexual experience led me to believe that this was a normal part of teenage sexual exploration. There was a level of excitement and validation I felt from his attention.

In the fall of 2005 Minor Victim-2 left the city to attend boarding school and I began meeting with the defendant individually. The defendant offered me a position at the CD store where he worked and the job provided us with more time to spend together without my parents' knowledge. When the defendant began pursuing me romantically, I felt chosen and special. It was a feeling I wasn't getting at home or in school, and I continued to chase that feeling, not knowing it would be much to my detriment.

As a child who had just lost her closest friend, who was gaining independence and growing more distant from her family, I was desperately seeking belonging, foundation, and attention. It's clear to me now that the defendant didn't choose me because I was beautiful or special or more mature than my peers, as he led me to believe at the time. He chose me because he saw these vulnerabilities and saw that I made a perfect victim.

The defendant and I carried on our so-called relationship in secret, knowing that our age difference made it illegal. While the defendant's family was aware of what was

happening, they were greatly concerned about the legal repercussions he could face if this ever came to light. The defendant has always been fiercely protected by his family and I knew that if anything ever happened to him, that I would be held to blame for it and there could be great consequences for me. Despite his family's objections, the defendant told me I was worth the risk. He knew that as long as he had my loyalty and devotion, there was never any risk to him at all.

My parents were not made aware of this so-called relationship until I turned 16 years old and I introduced the defendant to them as my boyfriend. My parents were easily charmed by the defendant and saw no reason to be concerned for my safety. Since I was a young child, my parents have always seen me as a wise and old soul. They saw that I was fiercely independent at 16 years old and they believed I was mature enough to handle a relationship with a man five years older than me.

Had my parents known that for years I was routinely sneaking out of their house to meet with the defendant, had they known what was happening those many nights, they never would have approved. I know that with the facts of this case coming to light, my parents now deeply regret not stepping in to protect me from the defendant. Even with the defendant's arrest, it took some time for them to understand that this was not just a case of a man that I once dated going on to do

terrible things. This led to a deep fracture in our family that we're still working to repair.

I can understand why my parents made these hurtful assumptions, as I have seen counsel for both the government and the defense refer to this as a romantic relationship. I now understand that if this had ever been a legitimate relationship, it wouldn't be a source of bragging rights for a pedophile in a Telegram chat. I now understand that the defendant recorded our sexual acts to have trophies of his child sexual abuse. He shared his trophies with strangers on the internet and took pleasure in recalling my abuse and further victimizing me. I hope that Your Honor can see what I see, that this is, in fact, a case of prolonged child sexual abuse.

This form of abuse is so insidious because to the outside to the victim it appears to be a romantic relationship. In fact, the only evidence of this being a romantic relationship exists in my personal diaries from the time. These diaries contain the words of a child with a malleable mind, whose understanding of love had been shaped by years of grooming and manipulation tactics by the defendant. I provided these diaries to the government to help establish a guideline and details for the crimes committed.

Throughout the years with the defendant I would find sexually explicit photos and texts from other teenage girls in

his phone. When I would confront him about the texts, he stonewalled me, staring at the floor and refusing to speak. Then he would cry and tell me that he had a problem and he couldn't control himself and that he loved me and that he never meant to hurt me. After one such confrontation the defendant got on one knee and told me he wanted to marry me some day. He taught me that if I could endure these betrayals and remain faithful, I could earn the love of the defendant.

I thought that if I could just keep the defendant sexually satisfied, I could earn his fidelity. I spent every waking moment I could with him, knowing that in my absence he would seek out other teenage girls to have sex with. My life became engulfed by the defendant and his sexual needs, but it was never enough for him.

The defendant was aware of this problem well before he ever met me and he has been aware of it for all these years. This show of remorse that he put on for me, that I'm sure Your Honor has seen many times in the courtroom, is not for the harm he has caused. He's seen the harm he caused me for many years and remained relentless in his abuse. He's played upon the empathy of the people that loved him, while secretly taking pleasure in the humiliation he has caused them. When faced with accountability, the defendant has made himself the victim, instead of accepting his responsibility as the perpetrator.

By the dime I graduated high school I had no close

friends my own age. Even when Minor Victim-2 returned from boarding school, the defendant used me to lure her back into sexual interactions with him. This ultimately led to the dissolution of my friendship with Minor Victim-2, and I have carried the guilt of that for many years.

The few other close friends I had in school saw the defendant for what he was, a predatory older man. They saw my loyalty to the defendant as a lack of self respect, and so I distanced myself from them.

For the most part, my relationship with the defendant afforded me a social status I felt I couldn't achieve on my own. When I first started school I was so shy and socially awkward that kids in my grade called me "The Mute." Being the girlfriend of the man who had been so popular at our school allowed me to navigate the difficulties of high school social life with a level of confidence I never had. My identity was so wrapped up in my relation to the defendant, I couldn't see myself without it.

After graduating high school, I deferred my college entry to spend a year living with the defendant in a group house with his family and friends. During this time I was prone to depressive episodes, spending days unable to get out of bed. I began drinking heavily with the other adults living in the house, and I was prone to blackouts and emotional outbursts. The defendant became resentful of me and the burden

I placed upon his life. I was no longer his perfect teenage victim. I was a traumatized adult taking up space in his room. Once again, the defendant made himself the victim of the pain he had caused me.

For most of my adult life I have abused alcohol and substances to cope with the pain of my past. Through this process of facing my past I've been able to understand the source of my alcohol and substance abuse and finally achieve sobriety. I understood that if I persisted in trying to numb away my reality in this way, it could ultimately lead to my death.

It has been said that though so-called relationship ended when I left for college, but that's not entirely true. In the fall of 2011 I left for school with the understanding that we would maintain a long-distance connection. The defendant led me to believe he still loved me and wanted to marry me some day. And after I returned from school, we lived together again.

The defendant saw me leaving for school as an opportunity to finally dispose of me. He immediately began distancing himself from me. And I learned that the very night I left, he went out to a bar and exchanged numbers with a female bartender. The idea of losing the identity I had built around the defendant was extremely distressing to me and I fell deeper into depression.

After one semester of school I dropped out and returned home, hoping to repair a relationship that I thought had been fractured by distance. It is only after I sacrificed my education that the defendant informed me he had started a new relationship. He told me it must be nice to be able to so frivolously throw away my college education, as he did not have the financial means to do so. Once again, in the face of my pain and heartbreak, the defendant managed to position himself as the victim.

After I left my home of Washington, D.C. and attempted to start a new life, the defendant continued contacting me to solicit nude photos of me. Because my understanding of love was so intertwined with sexual exploitation, I took it to mean he was still in love with me and I obliged his requests. The defendant then informed me he posted a nude photo of me on Craigslist without my consent, soliciting strangers to have sex with his teenage girlfriend. I begged him to take the material down, but when he refused, I spent hours scouring the back pages of Craigslist to find the posts and have it removed before he finally relented.

The degradation and abuse I experienced for so many years led me to believe that I deserved this treatment and that it was unique to me. I felt powerless to stop it. I accepted that this online abuse would likely continue and I tried to live in denial. I had hopped that the defendant would

eventually move on and settle into his new relationship, forgetting me, as I tried to forget him.

The defendant's relentless online abuse has ensured that I will never forget him. For me, there will never be a day that I get to know that the videos of my abuse are not accessible online or in the possession of strangers.

As a person I've always been disposable to the defendant. But as an object he could repeatedly exploit for his own sexual pleasure, I have been a prized possession. I have existed for decades on a portable hard drive as nothing more than a series of files among 1,619 video files and 987 images of child sexual abuse material. I have lived the horrifying details of only a handful of these video files and I can only imagine the suffering of these victims. These victims are unaware that they've existed in this space with me and they cannot speak to their experiences. It is not only for myself, but for these many child victims that I finally come forward to share my experiences and speak the truth about the defendant, to seek justice for us all.

My involvement in this case has come at no small cost to me. For the past two years I have been forced to recall traumas from my past and consider the impact they have had on my life. This has taken a severe toll on my mental and physical health and has impacted my personal and professional life. I have been diagnosed with complex PTSD and the symptoms

I suffered with for many years have only been exacerbated by this legal process. I have suffered from insomnia as I've ruminated over the past and experienced feelings of shame and worthlessness.

When I first wrote this victim impact statement, I was told by my doctor that I have lost 26 pounds since the beginning of this case due to stress and lack of appetite. At a recent doctor's appointment I learned that my weight loss was now up to 37 pounds. I became hypervigilant in my relationships as I lost trust in people. I've been estranged from my family and isolated from my community.

As I looked back at my past abuse, I blamed myself for not seeing it at the time. I lost trust in my ability to discern danger in people and protect myself from it. Intimacy, love, and connection should be the best parts of life. But for me, they are the things that I fear most. As I saw my life falling apart, I became reclusive, as I wanted to hide it from friends and family. I spent months in a disassociated fog, losing hours, days, and weeks of time as I tried to cope with the reality of my situation. If it had not been for this reckoning, I may never have come to terms with my past and seen how it was actively harming my present.

I can truly say that this entire process has destroyed the life I knew, but I can see now that it was a life that needed destroying. For many years I've carried this shame

and suffered the consequences of the defendant's actions, but it was never my mine to carry.

Many victims of abuse refer to themselves as survivors, but I've been reluctant to do so, as I did not know if I would survive this process. Suicidal ideation is a voice that has lived in my head for most of my life, that I have to work every day to silence. There were times throughout this process that this voice became so loud it was like the background noise of my everyday life.

According to the CDC, survivors of child sexual abuse are 2 to 13 times more likely to experience sexual revictimization in adulthood. That is a statistic that I have also fallen into. My experiences with the defendant not only made it more statistically likely to happen, but they ensured that when I encountered that moment of sexual violence, I wouldn't understand it for what it was. I would be able to trust and care for my rapist and, afterwards, I would comfort him because I understood that he was just another man, like the defendant, who couldn't control his impulses. Years later, when I would call a rape crisis center, I wouldn't even be able to answer the first question: Have you been a victim of sexual violence?

Sexual violence is what I grew up understanding sex to be. My sexuality is born into abuse. My identity was supplanted by the defendant's fantasy. The most devastating,

lasting impact in the defendant's abuse has been the loss of my identity. I have had to mourn the loss of the girl I was before the abuse and I'll never know what life she could have lived if it had never happened.

While the government asserts that this plea agreement was reached with consultation from myself and my counsel, I would like to convey my experience of this consultation. Through my communications with the government, I understood that a likely outcome of this case would be a plea agreement in which the defendant would plead guilty to the lead charge and the Court would have the discretion to determine an appropriate sentence within the sentencing guidelines.

In the months leading up to the plea agreement there was no indication from the government that this disposition had changed. On July 23rd, 2025 I received an email informing me that the government intended to offer a plea deal to the defendant, binding the Court to sentence him to 15 years, the mandatory minimum for sexual exploitation of a child. In this email I was also told I was welcome to attend the hearing, but I would not be permitted to speak.

The next morning I responded to the email and requested a meeting to discuss my concerns with the proposed plea agreement. That same day the plea offer was sent to defense counsel and my brief window of opportunity to express my objections and concerns had closed. It was only after the

plea was sent to defense counsel that I sought additional advice and understood that I did have the right to be heard at the plea hearing. To be clear, I understood this at the time of the plea hearing and I chose not to speak.

It is only through the tireless and exceptional work of my counsel that I was able to file an objection, objecting to this plea agreement and ensure that Your Honor heard all of my concerns before deciding on whether to accept the plea agreement. I'm eternally grateful to them for making me -- helping me to make my voice heard in a process that often keeps victims in silence.

I hope Your Honor rejects this plea agreement and the parties reach a new deal that allows you to decide the appropriate sentence or the case goes to trial.

Regardless of how Your Honor rules, I hope that my words will impact the way the Court views cases like this and the way the government works with victims like me in the future. I hope that the government will understand that teenage victims are still children, incapable of understanding their own sexual exploitation. While this is not the kind of case that is commonly seen before this Court, it is a common experience for so many young women and girls.

I hope that by sharing my story, that other victims like me will know that they are not alone. I hope that they will see that they are not meant to carry shame and blame

themselves for the actions of an adult man. I hope that they will not feel obligated to explain the dynamics of abusive relationships that keep them trapped with their perpetrators for many years. I hope that, in the future, they will not feel obligated to lay themselves bare before the Court in order to prove themselves worthy of justice.

Thank you for your time.

THE COURT: Thank you for your letter and for your courage in reading it aloud.

THE VICTIM: Thank you.

THE COURT: Ms. Shinskie, would the government like the opportunity to speak regarding the appropriate sentence in this case?

MS. SHINSKIE: Yes, Your Honor. Your Honor, because the issue was raised regarding notice to the victim in respect to her right to speak to the Court, I just want to set the record clear a little bit with respect to that.

As my filing makes clear, the victim reached out to the government on her own initiative and she was formally interviewed because of that. After -- she was interviewed by the FBI. The government evaluated the evidence in the case and made a decision to do a superseding indictment in this case, as you know.

Throughout the time that the government interacted with MV-1 during this case, MV-1 repeatedly asked about two

topics; one was when she would be able to give a victim impact statement to the court, and also about what she referred to initially as her legal recourse, which was not clear to me exactly what that would mean. But it involved restitution, specifically with respect to the defined victim fund that Congress had set up.

And so I tried to provide information about that to the extent that I knew it. And we also, in our office, designated a victim advocate to have a direct relationship with the victim to answer those questions, which she did, starting, I believe, back in the summer of 2025 -- or, excuse me, it was August of 2024. The victim advocate who was assigned this case sent an email to the victim describing all of her rights under the CVRA, including her right to be heard at proceedings. Also sent her a link to the statute and explained each of those. I, myself, told her I'm not an expert on the CVRA, but I would -- but that the victim advocate would assist her in any resources that she needed.

With respect to the plea hearing and the plea negotiations, I just -- suffice it to say that there was background negotiation in this case. And during many conversations that I had with the victim, I initially told her what our first plea offer was. That was not accepted by the defendant. There was negotiation that brought up the prospect of the 11(c)(1)(C) plea. And in the government's view, in

consultation with management, we thought that was appropriate for the reasons that I'll discuss as we go forward here.

I did inform the victim in writing about the nature of an 11(c)(1)(C) plea, and I also told her in a phone conversation immediately after sending that email. And when the victim says here today that I told her she wasn't allowed to speak, or words to that effect, I think that what may have been in her mind is that I said there wasn't a victim impact statement opportunity. And I did say, in writing, that she would be able to come to the proceeding for a plea and not have an opportunity to speak. And what I meant was that's not normally something that happens in a plea agreement, it would be up to the judge. And I do remember in a phone conversation with her saying if I -- if you come to the plea hearing, I can signal to the judge that you're here and she can take that from there and allow an opportunity.

THE COURT: Just to clarify, under 11(c)(1)(C), I don't accept the plea at the plea hearing. I just hear about it and make sure there's a factual basis for it. This is the proceeding when I make the determination whether I'm going to accept the plea because that is bound up with my determination about the sentencing. So you haven't missed your opportunity to express your opinion. This was when it needed to be. But, if I don't accept it and the defendant is -- agrees to go forward and be sentenced anyway, I would still need to

calculate the guidelines, just as I did.

But the guidelines are not binding, they are advisory, and there's no difference with respect to that, whether it's an 11(c)(1)(C) plea or whether it's a plea with no agreement. The guidelines are supposed to be the starting point for my determination, but they are no longer mandatory on a court, that they have to follow them, under any circumstances, even if this plea were to be rejected.

All right. I'm sorry, Ms. Shinskie. Go ahead.

MS. SHINSKIE: Thank you, Your Honor. Just to complete this, I just wanted to add, as well, the Minor Victim-1 was added to our office's VNS, the victim notification system, and was receiving letters with language about the CVRA, as well as her rights under the statute. And it was August 15th, 2024, was the email that I referred to earlier, where our victim advocate informed the victim, quote, that she has a right to speak at any public proceeding, and included links to the statute.

And, finally, you know, just with respect to the plea agreement itself, as Your Honor is aware, these agreements don't get executed immediately and overnight. There was extended conversation with defense counsel in this case to negotiate the plea agreement, and I was keeping Minor Victim-1 informed of those negotiations. When we got to the point where we had an 11(c)(1)(C) component to the plea, like I said, I

explained that to her. But the plea agreement was actually not executed until August. It was more than a month after the letter, the plea agreement letter was conveyed that the plea documents were signed, and then there was some time after that before we were before Your Honor and the agreement was accepted. And, of course, today it hasn't even been accepted by Your Honor.

So, you understand, I know, but just to be clear, that's how this happened and there was never a point where the victim's opportunity to be heard on this was foreclosed, even as of today, and obviously she has had that opportunity. I just wanted to be clear on that.

THE COURT: And I want to hear your full allocution and I don't want to interrupt it, but I do want to ask you one more question, and I think I now know the answer, but I was going to ask you to clarify whether there's evidence that any videos created as part of Count 1 were shared?

The government has a footnote in its memorandum that says no, but it also says, on page 18 of your memo, that the defendant asked the victim for sexually explicit images and she learned that he posed a topless photo on a website without permission in an attempt to solicit other men to have sex with her, and she mentioned that now. And I think in her letter she talks about that as something that she sent to him later, when she was in college, or out of high school and no longer the age

that she was for purposes of Count 1. But is that the explanation of the disconnect between those two things in your memo, is her age?

MS. SHINSKIE: I believe that's right. I mean, when I was talking about the videos that were found by the FBI on her devices, there is no evidence that those were distributed by the defendant. And so that's what that first part of the memo was addressing. And those are the acts that were the substance of the charges in this case. I never saw any further evidence of the -- the topless image that was posted on the internet, that was all from interview with the minor victim. And it is my understanding that she would be the one -- the source on this, really, is that that happened later.

THE COURT: Okay. All right. Thank you.

MS. SHINSKIE: Thank you, Your Honor.

THE COURT: And did your investigation point to evidence of other girls during that teenage period for him?

MS. SHINSKIE: So the investigation -- there were more images and videos in the devices that were recovered by FBI that seemed to have been created around the same time that may have depicted teenagers. With age indeterminate photos and things like that, it can be difficult for the law enforcement to determine exactly who it is, unless they can be identified. In this case, obviously, with MV-1, she came forward and that's how she was identified, because she voluntarily came to us and

asked to be part of this.

She also knew one of the other -- Minor Victim-2 that was referred to as well, who, it's my understanding, was a year older than Minor Victim-1 and was four years younger than the defendant. And so there were images and videos, we believe, of her as well. The government did reach out to her and she was not interested in being a part of this.

So -- and I should say, I believe from my conversations with the FBI agent, like I said, there may have been others, but it was not clear because of the -- there was age indeterminate. They could have been adults they could have been teens and some were not identified. Does that answer Your Honor's question?

THE COURT: Yes thank you. All right.

MS. SHINSKIE: Do you have any other questions before I just --

THE COURT: No. Now I would like to hear what --

MS. SHINSKIE: Okay. I'm going to be brief when it comes to this because I filed quite a bit. But the government is here asking that the Court accept the plea agreement because it is reasonable, the agreed-upon sentence is reasonable and is sufficient, but not greater than necessary, to serve the lawful purposes of federal sentencing set forth in 18 U.S.C. 3553(a)(2.) The government urges the Court to exercise its discretion in this case to accept that plea and proceed to

sentencing under Rule 11(c)(3).

And the government acknowledges that, as the Court has already stated, the starting point here is the guidelines. The Court has already gone through the guidelines calculation in this case. And I think it's worth emphasizing how the two counts operated here to substantially increase the guidelines.

When Minor Victim-1 spoke to the government about her thoughts on how she wanted a disposition in this case, one of the things that she asked us was about the defined monetary victim's reserve fund. And that is a fund that is available for restitution to victims of child sexual abuse material offenses, but not child sexual exploitation. So, like, the production offense and the lead count in our indictment would not have rendered her eligible for that fund. Possession of child pornography would. And, frankly, that's one of the main reasons that the plea was structured in the way that it was. Because in our communications with her, that seemed to be something she wanted to have left open.

What it did on the other end was expose the defendant to a significantly higher guidelines range than he would have been if he had pled, say, just to the lead count of the indictment or the distribution or something else, obviously. And so that is a consideration here as well when we ask for -- or, we agreed that a sentence was reasonable that would essentially amount to a lower mid-guideline sentence.

In addition, there are many substantive reasons that the Court -- or, that the government has suggested that this is a reasonable sentence. First, the government would suggest that this is a very -- this is very serious conduct. And in our view, it's kind of two different buckets here. I mean, we have the child sexual abuse material, which was a substantial amount. It was very troubling, including the forcible rape of a toddler. And all of those components we find require, like, a very serious sentence, and that's why we're asking for the sentence that we're asking for.

We also recognize the harm done to Minor Victim-1. We're not attempting to minimize that, but we're recognizing that it is not the typical sexual exploitation charge that might be brought here, especially given the fact that it is conduct that's 20 years old when charged and that the defendant himself was relatively young when that conduct began; he was 19. Those factors are something we try to bring in in our analysis when we decided what we thought an appropriate sentence and plea would be.

So with respect to the first factor, the nature and circumstances of the offense, in the government's view, defendant's conduct was extremely serious. And we emphasize, you know, what was happening at the time of his arrest, he was distributing child pornography to an undercover police officer. And like I said, the video and the content of that -- those

particular videos was particularly disturbing and suggests a need for serious punishment.

In addition to the distribution of those -- that material, the defendant was also engaged in conversations with the U.C. about sexual abuse of the U.C.'s purported 6-year-old daughter. All of that is very serious in the government's view and make it a particularly serious distribution type of offense. The content that he was distributing and also the context of which he was talking to this undercover officer who was a purported father of a 6-year-old.

So we start there, and then there's this very large possession of child pornography, 1600 or more images on multiple electronic devices, that really was horrific in terms of its content. Some of the worse material that is out there. And then we look at the sexual exploitation of Minor Victim-1, which we also believe was serious and caused significant harm to her, and that is why we charged that offense.

Although the minor victim did not fully recognize the exploitation that was happening to her at the time, we recognize that the defendant preyed upon her youth and vulnerability over the course of many years in a manner that was harmful, cruel, and criminal, we agree with that, and that is why we charged that.

The defendant's sexual relationship with the minor victim was coercive, in the government's view, in many

meaningful respects. The defendant, knowing that the minor victim was young and inexperienced, he pressured her to cross sexual boundaries with him that she was not comfortable with. During one of her first encounters with him, for example, he pressured her to submit to anal penetration, even when she pulled away from him. He pressured her to dress as a schoolgirl. He did lots of things that, in the government's view, is coercive and harmful.

The defendant frequently asked the victim to send sexually explicit images. And in one occasion, as Your Honor has already asked, he posted a non-consensual image of her on the internet. Now, all of these factors highlight the harm that was done to the minor victim and, again, in the government's view, suggests a very serious offense here.

These are the circumstances the government has acknowledged elsewhere in the memorandum. And we do note that there is circumstances that distinguish this case from others, with respect to the 2251 charge. However, when considering all the defendant's offense conduct, spanning from his sexual exploitation of Minor Victim-1 in the past, to his continued possession and distribution of child sexual material, it's clear to the government that the nature circumstances of the defendant's conduct merit a sentence that includes a significant period of incarceration.

With respect to the history and characteristics of

the defendant, even though the defendant has no prior criminal convictions, his conduct in this case was obviously not a one-time lapse in judgment. Rather, the defendant has a long history of serious and harmful sexually abusive behavior towards minors.

Although the defendant's sexual exploitation of Minor Victim-1 occurred when she was relatively young, he continued to engage in the possession and distribution of child pornography as he grew older, and even as he became a parent himself. The defendant's behavior, thus, demonstrates dangerousness and a compulsive drive to sexual exploitation. It also makes it just a lack of empathy for the children that he is harming, and these are concerns with respect to the characteristics of the defendant that the government can see.

With respect to the seriousness of the offense, the promotion of respect for the law and just punishment of the offense, here, the defendant made the conscious decision to amass a large collection of child pornography and to distribute some of the most vial and violent child sexual abuse material, depicting the forcible rape of very young children. In addition, the defendant sexually exploited MV-1 over the course of years and caused her harm. A significant period of incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the offense.

With respect to deterrence and the protection of the public, here, the defendant's sentence should be sufficient to deter not only the defendant from reoffending in the future, but also to deter the criminal conduct of others who engage in or are contemplating in engaging in the trafficking of child sexual abuse material or in sexually exploiting minors, like Minor Victim-1.

In the government's view, the agreed-upon sentence of 15 years incarceration, followed by a lifetime of supervised release adequately serves this purpose.

With respect to sentencing disparities, this is an important point in the government's view here. Our memo cites several different cases that have been before this Court, including one that Your Honor sentenced in -- I believe it was 2019, where we have serious conduct that was resulting in sentences below -- significantly below guidelines range. The case we cite that was before Your Honor was United States versus --

THE COURT: I'm familiar with the case. I think they're hard to compare, but I understand.

MS. SHINSKIE: Very well, Your Honor.

THE COURT: It was also a (c)(1)(C) plea.

MS. SHINSKIE: Some we recited were(c)(1)(C) and others were not. But as Your Honor is aware, there are many times that cases with these guidelines are -- sentences are

below guidelines. It really requires a careful analysis. And I think one important point here is, you know, this case is unique in terms of the difference between the two counts and the two sets of conduct.

In the government's view, there really was a difference, if you had -- if evidence had shown that, you know, in the 20 intervening years between the initial conduct that happened in 2005 and then the 2024 arrest, that there had been more acts of sexual exploitation, obviously that would be a really different situation here. Or, if there had, you know, been a growing or escalating pattern of conduct, that, I think, would also be a very different situation.

But here what we have is almost the reverse. I mean, we have a very serious crime of distribution of child pornography and the possession of a lot of disturbing material, that in and of itself would have merited a significant sentence. And then there is disclosure of something that happened a long time ago, when the defendant was much younger, but that -- in the investigation there didn't seem to be more of that conduct revealed, either in his devices that we were looking at or other testimony from people who might have come forward. And I think that that's another significant factor in why a sentence below the guidelines would be appropriate in this case.

But we do emphasize that it also -- 15 years is no

joke. I mean, it's a very serious sentence and the government recognizes that and thinks it is appropriate given the conduct, the dangerousness and the harm in this case, Your Honor.

THE COURT: Thank you.

MS. SHINSKIE: Thank you.

THE COURT: Mr. Lawlor, would you like to speak on the defendant's behalf?

MR. LAWLOR: Yes, Your Honor. Thank you. Your Honor, I want to sort of pick up where the government left off there. You know, as the Court noted, sometimes these cases start to sound like an exercise in arithmetic, and especially in CSAM cases where there are so many factors that can take an offense that starts at a base offence level of 18 and next thing you know you're at a 44. Considering that the base offense level for murder is 43, I think the guidelines here are, of course, a step in the process and a factor the Court has to consider, but I don't think they are the most important thing for the Court to consider in fashioning a sentence that is reasonable.

Mr. Seestedt was 38 years old at the time of his arrest. With good time and whatever other reductions that he might benefit from in the Bureau of Prisons, he'll be likely 50 when he's released from his incarceration, and then subject to a period of lifetime supervision. So just in terms of punishment, Your Honor -- and, of course, the prison sentence

is only one part of that punishment, there are other factors, of course, real ramifications that we often forget about. But this sentence that we're talking about, to borrow Miss Shinskie's phrase, is no joke. This is a lengthy, punitive -- I'm not saying it's not warranted under the circumstances of this case. I certainly would note that but for the mandatory minimum, I would be asking for a sentence significantly lower than 180 months, and I think there are arguments in favor of that. But given the mandatory minimum, I think that a 15-year sentence certainly captures the need for punishment.

Your Honor, as Ms. Shinskie said, in terms of the Count 1 offense, and at the risk of -- I don't want to regurgitate what both parties have submitted in their written materials or replace what Ms. Shinskie said, but at the time of the offense Mr. Seestedt was 19 years old and, really, for his entire adult life has been in the throws of a series of mental health challenges, that so often, as it did with Mr. Seestedt, led to substance abuse problems that have been untreated. It's really only now that he's begun the process of receiving and benefitting from treatment, I think, as difficult as these two years have been, primarily, Your Honor, because of the separation from his wife and minor child.

The person that Mr. Seestedt is now, even today, is much different than the one who entered that jail two years ago. And obviously, Your Honor, the Court knows in the Bureau

of Prisons he will benefit from a lot of treatment, not only directed, as the Bureau of Prisons does, at CSAM offenders, but, I think, also during his incarceration and after his incarceration specific to the challenges that he has had to confront that really have not been addressed. And I think Ms. Hunt noted that, you know, some of the conduct in Count 5 was really sort of an escape mechanism from an inability or a lack of awareness of how to confront mental health challenges that he's had to deal with, really his entire adult life.

As the Court knows, Your Honor, Mr. Seestedt has a very large and supportive family. As I already noted, I think, you know, in terms of punishment, and one of the most significant challenges, is Mr. Seestedt has a minor child. There were, you know, infrequent but contact visits for some time. Those have been suspended, so now he has no contact with either his wife or his minor child. And I think that has been a really significant challenge.

I won't, sort of, repeat some of the things that Ms. Hunt noted in her report about those challenges, Your Honor. But as someone who has talked not only to Mr. Seestedt, but to Jessica, his wife, about the challenges that he's had to face, that has been a really difficult one for him.

There's no doubt, Your Honor, that these are serious offenses, both independent of one another and in conjunction with one another. They're, of course, real victims in both of

these cases. I think it is important that -- I hate to use the MV-1, I don't like that moniker, but out of respect for her privacy, I think it was important for her to speak because in a lot of these cases, Your Honor, we don't hear from the victims live; we may hear a letter. So as people who deal with these cases, Your Honor, Ms. Shinskie and myself, I think it's important for us to come face to face and recognize what the challenges are for the victims in these cases, and that obviously, Your Honor, dictates largely why there is a need for punishment.

Again, Your Honor, I think 15 years of incarceration, notwithstanding the guidelines here, is actually more than is necessary to achieve the aims of 3553(a). But given the mandatory minimum, I think the parties recognize that, looking at all of those factors, that is, obviously, a significant period of punishment. It will certainly deter Mr. Seestedt. I think it is a deterrent to the general public because of the length of that sentence.

But when you look at the history and characteristics of Mr. Seestedt, this is somebody, as I said, who's had, you know, a number of challenges, dating back to before he reached the age of majority. And as the Court knows, you know, someone who is 19, while an adult legally, is still not someone who, in terms of brain development, is a fully functioning adult. And, obviously, Mr. Seestedt had challenges in terms of his home

life, financial ramifications that he had to deal with because of choices that were beyond his control, and then, of course, Your Honor, these mental health difficulties which later in life led to problems with substances.

Through all that, Your Honor, though he did get his education, he had -- has formed a very tight bond, not only with Jessica, his wife, but he has close ties to so many friends and family, that you can see from the letters that were submitted. While he's been incarcerated, he's done what he can do to start the process of rehabilitation.

And I would imagine, in addition to punishment, you know, one of the Court's main concerns, if not the Court's main concern, is reoffending. And I think it's important to note, statistically Mr. Seestedt will be of an age where reoffending is much lower than one would see in younger offenders. And also, given both the treatment that he will have in the Bureau of Prisons, the treatment that he will have while on supervised release, the simple fact that he will be on supervised release and know that reoffending could send him back to prison.

But also, Your Honor, you know, the family support that he enjoys, I think that, the totality of that, will aid him immensely in making sure that, you know, what occurred not only when he was 19, but more recently won't happen again. I do believe there is a direct correlation in this case between Mr. Seestedt's mental health challenges and the more recent

offense conduct. And so I do think that the treatment that he has yet -- or, at least certainly up to the time of his arrest, is something that Mr. Seestedt didn't have the benefit of. I think that is going to benefit him, most importantly, in making sure that he doesn't reoffend, but also just help him become a better husband, a better father, and a better citizen.

I think, Your Honor, looking -- as the government noted, other sentences of similar cases -- and just anecdotally, it's been my experience that almost in every case I can think of, the Court has varied below the guideline range, because I think there are a multitude of arguments that the guidelines here are really excessive in relation to what is an appropriate disposition, what is reasonable, what is sufficient, but not greater than necessarily, to achieve the purposes of 3553(a).

I think 180 months certainly does capture those goals and I think it is a well thought out recommendation by the parties and one the Court should bind itself to. Thank you.

THE COURT: Thank you. Mr. Seestedt, this is your opportunity, if there's anything you would like to say before I impose sentence in this case. You can come to the lectern with your lawyer.

THE DEFENDANT: Um, it's -- it's -- it's really hard to start. But, I think I know that my family knows that I am so sorry. Every day I am so sorry. Every day I take

responsibility for my mistakes, my failures. Every breath that God grants me is one more breath that I can use to beg for forgiveness, to pray for mercy. Sorry. I know that my crimes are awful and do not deserve mercy. But God knows my heart, Jesus knows that if it were deserved, it would not be mercy. I may never see any victim of my crimes face to face, but I assure you I will always feel sorry when I look into the faces of my family. I'm sorry. They will always be my family. So every day that is blessed with me, I'm also blessed with family to push me, to walk -- and to walk with me in a path that he intends.

I've ruined lives, my family, the victims. I've really forever changed my life, the one that we share with our baby. My actions have forced my brothers and my sister and my mother and stepfather, my mother- and father-in-law, my wife, my uncles, aunts, and cousins and their families to heal in different ways.

This healing is exclusive and different for each person and has created separations and divisions on those togetherness. And that does not mean there is no love, but most certainly there is love lost. And this is unforgiveable, especially in regard to our daughter, [redacted].

I will never forget the birth of our daughter. The strongest person I have ever known fought most of the night and all morning to bring her into this world. I thought I was

going to lose them both. With God's blessing, our daughter was laid safe onto her mother. And after I asked the nurse -- after, as the nurse laid and wrapped [redacted], I hovered over her and [redacted] opened her eyes and looked at me with her beautiful blue eyes.

I remember crawling on the floor with [redacted], sometimes chasing, sometimes being chased and she would crawl around, crawl into our bed. And I would do the same on the other side, we peak our heads out, sharing the biggest smiles before crawling into each other's arms. I'll never forget pushing her in the stroller as we played peakaboo. And she would look over the side of the stroller with her bright, wonderful smile and then whip her head to the other side in anticipation. I'll never forget her reaching up with both arms, hands open, just wanting to be picked up by daddy.

I have not held my wife or [redacted] in over a year. In 15 months I have not hugged our baby, I have not kissed the one person I vowed to support through everything in life, the one person who is still with me. I'm so blessed to see them for the time that I can, the hour I can during the week. But every time my heart breaks seeing my 3 1/2-year-old stretch her arms against the glass, giving me a kiss against the glass. I'd never wish that on any person. And it pains me that [redacted] has to share love in that way. I am so blessed, I am, that I get to see her at that time and see her during the visits, and all

thanks to her mother. I'm very blessed.

I know that I've broken laws, I know. And I cannot begin to express the sorrow, the remorse, and the sadness I feel.

I am so sorry and I'll live with the regret and shame every day. I have to try to forgive me self for not being a dad that is present, and every day I pray to God to protect my family. The gospel says that once I am a father of Christ, my past falls away. But I know from my daily prayers to Jesus and to Mary that this is not a one-time thing. Every day I fight my shame and my past. It's a daily struggle to get closer to God and to be the best version of me.

Excuse me. I have worked with what little there is, the little help there is at CTF and still have been able to find a place for growth. I am proud to say that I was baptized the same year as our daughter. And I am blessed to share that. I lead a bible study every day and I am proud that even though my relationship with Jesus is new, I can hold fellowship by focusing on scripture, both Old and New Testament. I participate in Spanish and Catholic services twice a week. And I sincerely really look forward to growing my relationship with God.

I have four certificates, workforce development certificates, one a 12-week course, another a 30-hour class, six OSHA certificates, maybe 150 hours of class time. But the

best thing I've been able to do is to -- is that I've had the opportunity to continue my education. I've earned 30 transferable credits and maintained a 4.0 GPA from Georgetown University. Currently I'm enroll in two credited Georgetown cases and another class offered through MIT. I work on the unit, cleaning bathrooms, but I also volunteer and tutor others for GED testing.

This -- this gets harder and harder every day. You know, I live with violent people that brag about the harm they caused others. I will never and could never knowingly hurt someone, although I see how my actions fuel a viscous cycle of real evil and how they harbor an environment of harm to our most vulnerable, our most cherished, our most innocent, our children, my child.

Further, I took advantage of relationships and betrayed trust I was shared. And I'm so sorry for the harm, for the hurt that I've inflicted. Every day is a challenge I face alone, but I have the opportunity to face them with my wife, our baby, and Jesus in my heart. I pray that I can find the words to undo my crimes and actually bring hope. But I know it's a fairytale.

I just hope these words have some positive effect on the outcome my family shares with me, that these words show somewhat how sorry I am, because I'm so sorry. I never wanted to hurt anyone. I am sorry. I apologize to the victims, I'm

sorry to the Court. I'm sorry to my family who stand with me while I do not deserve it.

I am sorry to my wonderful wife. She's so loving and dedicated and strong and I will always be sorry to her. She's the rock and my source of strength, my partner whom I've abused with my deception and my addictions. I'm so sorry and I pray that one day you're going to forgive me. And I pray that one day you can forgive me, [redacted]. [redacted], my little Seestedt, our wonderful baby.

Sorry. Thank you. Thank you very much.

THE COURT: Thank you. I'm going to -- I have a lot to absorb and a lot to think about and a very important decision to make, and so I'm going to take some time to do that now. And I'll return when I'm ready to impose sentence in this case.

(Recess from 11:24 to 11:36 a.m.)

THE COURT: All right. I've been informed the government has some information it wishes to impart.

MS. SHINSKIE: Yes. Thank you, Your Honor. Your Honor had asked me in direct questioning about whether images of the victim had been distributed or whether the government had evidence of that, and I said we did not have evidence of that. And I have to clarify that there was evidence in the KIK return, like the KIK submission, that we did a search warrant for his KIK accounts, and there was evidence of the victims in

that, where he was sending those images to other people. He did not send them to the U.C., but he had sent images of the victim to other KIK users, as apparent through that return.

THE COURT: And do we know when? Just during the period of the time that the account was, in 2024?

MS. SHINSKIE: I can't tell you as I stand here when those images would have been distributed. I don't even know if the return can say that for sure. I would have to ask the agents with more -- they would have to go through and look.

THE COURT: But do you know when the account was created?

MS. SHINSKIE: They would know that. I don't know that as I stand here today.

THE COURT: All right. But it wouldn't date back to 20 years ago?

MS. SHINSKIE: No, it would not. KIK wasn't even around that many years a ago.

THE COURT: All right. Thank you for correcting the record. We're still going to be adjourned for some period of time.

(Recess from 11:38 a.m. to 12:26 p.m.)

THE COURTROOM DEPUTY: We are back on the record with criminal case 24-235, United States of America versus Gustav Seestedt.

THE COURT: All right. As I said at the beginning,

as I said when you pled guilty, sentencing depends on the consideration of a number of statutory factors, and I'm going to go through all of them and it's going to take some time. You and your attorney should return to the lectern for this.

The first factor that the statute tells me I'm supposed to consider when I determine what the appropriate sentence is for someone is the nature and circumstances of the offense. And with respect to Count 1, that was a sexual relationship involving intercourse, oral sex and anal sex, beginning when the defendant was 19, fresh out of high school, and the victim was 14.

The defendant points out that they were only four years and ten months apart, and four years would change the situation under D.C. law. But that's much closer to five years than four years. And the characterization of the relationship as noncoercive and consensual indicates a lack of insight into its true nature, even now.

By that age you are already sexually active and had been for some time. You were turning to adult pornography as a means of satisfying your own sexual desires. And you draw someone with limited self esteem, difficult family situation, that you got physically involved in when she was just a rising 9th grader, into being videotaped while having sex, and to accepting the anal penetration she didn't want, and to wearing certain out fits to satisfy you, and asking her to transmit

sexually explicit images of herself to you. All things she told the government investigators that, no, she wasn't comfortable with, even then.

I find it hard to believe that at that time you didn't perceive the disparity at some level. As she explains, the first time she was with you was the first time she ever kissed a boy. And you make sure she's relaxed, because it's the first time she's ever smoke marijuana, and things move pretty quickly from there.

As she saw you, you were popular, a big man on campus. But she, to you, was in your little sister's class in school, the sister who looked up to you, the sister for whom you were often responsible, the one you walked home from school to keep safe, the one you made sure she did her homework. You had a living example in your own family of how exactly big that age difference was. And your sister, as she wrote in the letter saw this as a betrayal of her, too.

It is somewhat mitigating that at that time, that it was understood by the two of you, I believe, and by those around you, that this was, to some extent, consensual. That you were seen and portrayed yourselves as girlfriend and boyfriend openly, around your parents, at least, and later, whether she was still only 16, around hers. And no one did anything to intervene.

We learned from her letter that her parents didn't

actually know until she was over 16, which -- and she says that you were secretive because you knew your family disapproved. I don't think that's the way your sister saw it because she reported to me in the letter that she disapproved and felt it was very much out in the open at her house.

So, the victim in this case was clearly failed, not only by you, but by all the adults in her life and your life. And, to some extent, this is different than what is often seen in child exploitation cases in terms of the age of the parties and the nature of the relationship. And notwithstanding how the victim saw you and the role you played in the high school, in many ways you were also an immature and unwell teenager, even if you hid that side from her.

I believe that you're being sincere when you say at the time you had genuine filings for her. And I think she was candid with the government when she said that at that time she believed she was in a committed relationship too.

And I want to tell her, I want to tell you directly, Ms. Lanman, that you do not deserve to feel any shame whatsoever. It was not your fault. It was not your fault that you didn't understand and you didn't do one thing to bring this on yourself.

And, yes, there came a point when she had reached the age of consent in D.C. and it's still going on, but that doesn't make what happened before okay. And what troubles me

is that even now, all you seem to be able to muster when you talk to the forensic psychologist is: Looking back now, I can see where the age difference could have created imbalances in the relationship. That's something of a mild revelation. There's a lot more to it than that. And I have to tell you, it was somewhat shocking to me earlier that through the tears and the remorse expressed in front of me earlier, it was 100 percent about the impact on your family and you did not muster any words of empathy for her.

So, I think I have to say, that when you talk about the nature and circumstances of the offense, the essence of this offense is there was an imbalance in this relationship; in age, in experience, and who had the control. She had no context for or understanding of what you were asking her to do that would enable her to establish boundaries, to reject your suggestions, you were the one deciding what they would do, that it would be filmed.

And that's why there is such a thing as an age of consent in every state. That's why, when she gained even a little bit of maturity, she came to realize that it had been an exploitative relationship, that it harmed her development into a healthy adult woman. We saw all of that just laid out on the table for everyone to see today, and it's why re-experiencing it has been excruciating. And I agree with her, that her age, her immaturity and her family differences, the vulnerability,

were part of the attracts for you, whether you fully understood that at the time or not. And it warrants a significant period of incarceration.

But while her vulnerability was part of the attraction, I also think it's part of what made her familiar and comfortable for you, given your own background and your own difficulties that you had at home. You were both, at the end of the day, people who were misunderstood and emotionally neglected.

It's also relevant, and the government talks about this, that this offense took place 20 years ago, when you were between the ages of 19 and 22, immature yourself. And there's no evidence in the record that you engaged in the sexual exploitation of any minor after that distorted relationship.

But I do have to ask myself, what are we supposed to make of the fact that 20 years later you still had the photos, that you're sharing them, and that 20 years later you were making even more dangerous suggestions about abusing children that you believed to be real, which brings me to Count 5.

Now we're not talking about adult pornography anymore, we're talking about child pornography. We're talking about a substantial collection that includes toddlers, infants, bondage, men forcing themselves into prepubescent girls' mouths, ejaculating on them, forcing themselves into a child's vagina. One of these videos is 20 minutes long. To the extent

there are gradations of child pornography, these are among the worst.

The statement of facts includes a description of the forcible anal penetration of a prepubescent girl. A lot of big words. She was crying, she was trying to push the man away. She was being raped. This wasn't just on your computer. It's not something that just ended up downloaded when you had downloaded somebody else's entire file. This is the one you picked out to share. You were downloading this material, sharing this material. There's no empathy towards the children anywhere to be found.

And so I need to emphasize some things. This was not, as someone described it in a letter, the stuff that happened to you. It is not an incident that we can assume you can neatly put behind you, and it was not a mistake. It was conduct that had been going on for a period of time. By the time the search warrant was executed you had downloaded 1600 files of child pornography on your devices.

And we can't just say, well, it's just a possession of pornography charge, because there's no such thing. These are not animated images. These are not AI-generated images. These are real children. They're being violated in unspeakable ways. And that's just what happened when the camera was on. Wherever I have one of these cases, all I can think about is how did they get placed into position and tied up in the first

place? The person who creates a demand for this material bears responsibility, ensures that it's going to continue.

And as the victim impact letters make clear, and while they weren't read in this courtroom, they are powerful testaments. Every time somebody new downloads the material it's another violation. It means that while your friends and your family and you can talk about healing and putting it behind you, the victims never get the chance. And you didn't just possess this stuff you shared it. And to make matters worse, you were engaged in enthusiastic graphic discussions about abusing a 6-year-old girl. Now, we know you were talking to an undercover officer, but you didn't. You had the lingo. There was no reason to believe you were joking. You put your own daughter up for grabs.

While the forensic report, and to some extent the government, treat the facts of Count 1 and Count 5 as unrelated, you didn't seem to think so. You chose to tell the undercover officer that you had had sex with a 13-year-old girl when you were 18. This was a boast. This was a way of establishing your credentials. You were using this connection on at least an unconscious level. And the victim understands that it was still part of the picture later, and she made it clear to everybody in the room.

And you were talking about your own 15-month-old daughter in sexual terms. Now, you've said and everyone has

told me you would never touch your own daughter, but you offered to display her to the undercover officer so you could experience the undercover officer's arousal in person. No one put those words in your mouth, no one made you say them. It's true, you didn't take any further steps, and some people do -- and we've had those cases and they are dreadful -- and I'm assured that you would never. But we don't really know what you would ever because the search warrant was executed eight days later.

We can't minimize any of this. We can't look away. We can't forget who the victims are here and who deserve protection. And it's not you. This count also warrants a lengthy period of incarceration.

That is not the only thing the statute tells me I must think about. I'm also supposed to think about the history and characteristics of the defendant, which are much more difficult to summarize. You are a person of some obvious talents and positive character traits brought alive in the letters from your family and friends, and I'll talk about them in more detail. But many of the letters offer an incomplete picture. The bothers leave out half the story of your childhood and your wife glosses over quite a bit.

But you are also a person with longstanding mental health and substance abuse issues, symptoms of which were experienced in the full view of others and for which no

treatment or intervention has ever taken place. These were exacerbated by the considerable trauma, financial pressures, and disfunction within your immediate family.

And even with the benefit of forensic analysis, once you look closely at the chronology of everything that happened, it really isn't clear at all what connections there might be between any of that and the profoundly unhealthy, disturbing, and harmful conduct from 20 years ago and from just two or three years ago that brings you before the Court. We still have no idea how you got from there to here.

The presentence report and the letters tell the story about how you and your siblings were left to pick up the pieces when your family's life unraveled due to your father's addiction. Your mother appears to have been completely overwhelmed. Loving, but not adept, as your sister said, in the life department, and it was up to the kids to work, to fend for themselves, to live together, to manage to pay their rent for themselves and to put a roof over her head after her divorce. College for the son who was a good student and athlete was out of the question.

Your wife, Jessica, tells me what your siblings say as well, that you are capable of great empathy, putting other people first, unselfishly getting them through the trials that they have to face, the loving role that you've been playing in your daughter's life ever since she was born, even while you

were incarcerated. Your bothers describe your sense of determination and conscientiousness, the way you deliberate carefully over every detail, ensuring that everything comes out right.

Your brother Andrew used your fascination with LEGOs as a metaphor for the painstaking way you prepare, you internalize the instructions and you build, you work towards a goal. Your younger sister, who seems to have the best view of both the positive and negative events that transpired in your family, and was able to describe it all in detail, explained how, while you were devastated by the discovery of your father's body when you were only 18 years old, you were also the one who took it upon yourself to help her heal from that day.

And you were the one who had to figure out how to put a roof over people's heads when their childhood home was foreclosed upon; creating budgets, making sure the bills were paid for the crowded lodging that you were able to afford. Your ability to be loving and to take responsibility was lauded by your wife's family and friends of the family. You seem to have remarkable ability to put up a strong facade, to hide your insecurities. And even with these charges, we have a letter of support not only from your wife and siblings, but your mother-in-law, who calls you kind, respectful, and hard-working. This does not usually happen.

They are only a few people who are able to see past the facade and also report how overwhelmed you were, how scared you were by the new responsibilities imposed by your marriage and your fatherhood. The letters all emphasize the trauma of your father's decline, the divorce, your mother's poor financial choices that led to a lot of instability, and the horror of your discovery of your father's body.

They talk in glowing terms about your perseverance and your creation of a happy, successful life, your relationship with your wife and daughter. How, despite all of it, you were to get an AA degree at UDC and a high-paying tech job at a white-shoe law firm in D.C. where your work was rewarded and, they say, and then this happened. It's all very helpful and it's all real and it says a lot about your character and your potential, but it doesn't begin to tell the story.

This didn't come out of nowhere and this didn't happen in 2024. When you take the letters and the forensic report and the presentence report and try to put all the little undated events in order, it becomes clear that you have been suffering from a number of problems for a long time, that your problematic behavior and drug use went on in plain view for years.

The forensic report was detailed, but primarily descriptive and not clarifying. There's not a lot of

explanation offered and so much is unknown and unresolved. But from what I understand -- and I don't want to insult you for saying all this, but I have to say all this -- you were suffering from anxiety and depression as early as 7th grade; cutting yourself, ending up in the hospital in about 9th or 10th grade. Self-medicating with marijuana by the time you're 15 or 16. Your mother, overwhelmed by her husband's mental health and substance abuse issues, does not get you professional assistance.

By 2004, when you graduate high school, your parents are already divorced and your mother is depending on you. It's the summer of 2005, when you're 19, that you begin the relationship with Minor Victim-1, who was almost five years younger than you. You meet her through another girl your age, another girl too young to be doing what she's doing. She, the new victim, is openly sleeping over at your house. Your mother knows. Your family knows. Ultimately her parents know. No one on either side does anything.

You're 18 the day you discover your father's body and in a state of shock, apparent to all, but again there's no intervention. The foreclosure and eviction produced more obvious signs of illness, but you're forced to just soldier on. And you're the one they all rely upon to manage their finances and their anxiety.

The relationship goes on for several years. And as

with everything else in this case, everyone looking at the situation has a different account of why it ended. Did she take up with someone else? Did you break up proactively to protect yourself from being sad when she went away to college, or were you done with her? It's probably a mix of all of it, but I have no reason to believe that anything she told me this morning wasn't true.

In 2008 you meet Jessica. It's a long romance, and in the meantime you were finally able to attend college classes. You get your AA degree in 2016, which catapults you into a six-figure job at a law firm. In 2020 you get married. But none of this is without cost. We learned that the pressure of school, on top of work and the need to stay awake and get your work done, led to reliance on cocaine. But you were already susceptible to being addicted to substances anyway, and that you were a full-fledged addict, putting in those extra hours due to the currency of big law.

The letters want me to know that nobody knew. But your wife knew. You told the presentence report writer that this idyllic life that's been described in the letters and in the sentencing memoranda was repeatedly interrupted by her discovery of the empty packets. And again, there is no intervention, everybody's heads are in the sand.

Your daughter was born in 2023. This produces joy, but also additional financial pressure and profound worries on

your own part. Am I going to be a good father and husband and provider? While at the same time you were engaging in the exact behavior that created the financial pressures and led to the dissolution of your parents' marriage.

In sum, what we have is a confounding mix of real promise and potential and unexplained unacceptable behavior. The mental health problems appear to have long predated the particular stressors that the family points to, the death of your father. Saying that you were under financial pressure after your child was born and you were depressed and you were anxious and you were furiously abusing alcohol and cocaine at the time helps me and helps you to understand that there was something deeply wrong with you. But it doesn't really help understand the conversation with the undercover officer.

Judges are often asked to draw the line from addiction to theft and addiction to robbery and addiction to all kinds of antisocial behavior every day. But no one has explained how we get from addiction and your lifelong depression to here. It isn't at all clear how any of it explains the behavior and it's hard to wrap your mind around whether it mitigates the behavior. But it does point to the need to point to something besides just lock you up.

It points to the fact that there is something more complicated at stake, in addition to the undeniable criminal conduct, that there is a man who, in addition to causing pain,

has struggled to help others and relieve their pain, who has qualities he can build on and who is in need of a lot of help. There is a lot of work to do because you have to understand that you betrayed and hurt Claire, not just your family. Even when you said you were sorry for the hurt you inflicted and for the betrayal of trust, you did not mention her this morning.

You did talk about and I appreciate that you've experienced a renewal of faith while you were incarcerated and that is important as far as you're concerned, you're going to need it. And I don't mean to demean it or ignore it in any way, but the question of mercy and forgiveness and of your eternal soul is a question for a higher authority than me. I have to deal with the actions and consequences in this world and, believe me, that's more than enough.

A centerpiece of your sentence has to be and has to involve mental health treatment, substance abuse treatment, sexual offender treatment, a process of no longer papering over the problems, but looking at them with the assistance of a professional.

So that's the history and characteristics of the defendant.

And then what does the sentencing statute tell me? I am required by law to impose a sentence that is sufficient, but not greater than necessary, to accomplish the purposes that are set out in the statute. And I have to figure out the need for

the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence of you and other people to criminal conduct, to protect the public from further crimes committed by you. And right now I believe they deserve that protection because no -- we haven't even begun to get to the root of the problem. But I also have to think about how do we provide you with the educational and vocational training and medical care and correctional treatment in the most effective way. And I also have to think about the need to avoid unwarranted disparities, differences among defendants with similar records who have been found guilty of similar conduct.

The guidelines are supposed to serve this function, but they don't always provide enough room to adopt to individual circumstances, especially when we get to the child pornography guidelines. It's relevant here that Count 5 was added to advance the victim's concerns and preferences, but it had a dramatic effect on the total guideline calculations for reasons unrelated to her case.

The submission filed by her lawyer was a full-throated support for the guidelines, but it's well acknowledged by many courts, and certainly every court in this district, that they are particularly draconian and duplicative. You get two points for using a computer. There is no offense that does not involve the use of a computer. We're already at a high

level because there's a child, and then there's additional numbers added for children, additional numbers added for the conduct being sadistic or masochistic. But what possible abuse of a child could not be sadistic or masochistic?

So it's all problematic from a policy standpoint. And that is because the child pornography guidelines were not derived from the sort of empirical analysis and assessment of data that is supposed to produce the guidelines. Rather, they were imposed by Congress and they represent a political calculation, a political determination, and they are not grounded in the kind of work and expertise the commission was supposed to bring to the table.

Federal Rule of Criminal Procedure 11(c)(1)(C) specifically authorizes the parties to agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision in the sentencing guidelines or policy statement or sentencing factor does or does not apply. And it permits the Court, and Congress passed this, too, to accept an agreed sentence.

Operating under the previous version of Rule 11, the D.C. Circuit held that a Court may accept a plea agreement with an agreed sentence, even if that sentence varies from the applicable advisory sentencing guideline range. That the sentencing commission itself countenances this is set out clearly in a policy statement found in § 6B1.2(c). It says:

In the case of a plea agreement that includes a specific sentence, Rule 11(c)(1)(C), the Court may accept the agreement if the Court is satisfied that either the agreed sentence is within the applicable guideline range, or the agreed sentence is outside the applicable guideline range for justifiable reasons, which the Court has to specify.

So I need to emphasize that with respect to the person who came here today, who, as she said, never asked to be Minor Victim-1, and who asked for a guidelines sentence, 15 years is a guideline sentence for that offense. It falls squarely within the guidelines for Count 1. And even the guidelines say if the sentence imposed on the offense having the higher statutory maximum -- which is Count 1 in this case -- is adequate to achieve the total punishment, then the sentences on all counts shall run concurrent.

As to the woman who spoke in court today, she is still suffering the consequences of the predatory degrading behavior and the request she made was reasonable from her perspective. But as to Count 5, it is the prosecutor and the defense attorney and the Court who, unfortunately, see not just one case, but the whole range of cases and we have to put your case in that context. And I don't believe that Count 5 is the kind of count that would produce a sentence of 15 years. It would be markedly less, if it was standing by itself.

And after considering everything and listening to

everyone very carefully -- and I assure you, everyone who spoke in this courtroom, everyone who sent me a letter who did not speak in this courtroom, was heard -- I find the proposed sentence to be sufficient, but not greater than necessary, to achieve all the statutory goals and I will accept the plea agreement. I know that the victim will find this to be disappointing, but what I have to decide as a matter of law is not just what could be reasonable, but what is sufficient, what is necessary. And the law says I'm not allowed to impose a sentence that's greater than necessary.

It is the hardest decision that you make as a judge because you have to quantify something that is absolutely not quantifiable, and I have to accomplish a set of goals that all point in different directions. And so I want to emphasize to you, Mr. Seestedt, and to you, Ms. Lanman, and to the victims who are not here, that this decision is not meant to diminish the very real harm that your conduct caused. It does not mean that the pain and the lasting repercussions are not real, that the offenses are not worthy of serious punishment. It is and they are.

What it means is that 15 years is serious punishment, and that's why I find it to be proportionate, especially when you add the fact that the conditions of release imposed will be imposed for the rest of your life. I don't know if I've had that requested in any other sentencing I've had before me.

It's June of 2026, I'm sentencing you to incarceration until 2041. You may get out earlier for good time served, but it's still a long time. You're 39 years old now, just shy of 40. You could remain incarcerated until you're 50, or somewhere before age 50 to 55. By then Minor Victim-1 will be close to 50 herself.

Is that a long time? If I said to her: What were you like 15 years ago, when you were only 20? You would know that you've lived a considerable portion of your life since then. Fifteen years ago was 2011. Things we take for granted now didn't even exist. There were no Apple watches, there was no TikTok. Snapchat had just been launched. Instagram had just entered the mainstream. Netflix sent you disks in a red envelope in the mail.

These are superficial, unimportant things, but they give you some marker to conceptualize what that amount of time passing means. The next 15 years will include the last two and a half years of the current presidential term and three more presidential terms.

Another reference point is that Mr. Seestedt 's daughter is 3 years old. He will be incarcerated for her entire preschool experience and kindergarten experience, her elementary experience, her middle school experience, and her high school experience. And I don't say that because I think that's punishment, I say that because it dramatizes how long we

are talking about. And he will not be left alone with her even after he's released, until the therapists deem it to be safe. And there's going to be a fairly long period of adjustment first.

This sentence is not to be a slap on the wrist, and it is most certainly not a slap on the wrist. It recognizes the seriousness of the offense, it recognizes the need for just punishment, but it also recognizes the profound need for treatment, the fact that the likelihood of recidivism will decrease with your age and that you will be older when you're released; the defendant's age, the victim's age, and the state of the defendant's mental health, the complete lack of adult guidance or intervention at the time of Count 1, combined with his ongoing mental health and substance abuse problems occurring in plain view, without intervention, and the need to be sure that this sentence does not represent an unwarranted disparity between his sentences and the sentences that others get who engage in similar conduct are all circumstances that support the sentences agreed to by the parties.

The fact that the support network he has now, notwithstanding the charges, the fact that they're standing by bodes well for the likelihood of a successful reentry. And I believe the community will be adequately protected by the conditions of supervision that will follow him for the rest of his life.

But I can tell you now, Mr. Seestedt, that the response to any violation will be swift, and whatever lenience I may be showing at this moment will no longer be a part of the equation. There will not be three strikes in your case. There will not be second chances.

I'm also supposed this think about the need to provide restitution to any victims of the offense. Given the fact I need to a response to what the government filed by the defendant, I'm going to defer consideration, pursuant to 18 U.S. Code § 3664(d)(5), which can be no more than 90 days. And when we're concluded here, we'll pick a date to return and do that.

Therefore, in an exercise of my discretion, after consideration of all the statutory factors, the sentence to be imposed is as follows: It is the judgment of the Court that you are hereby sentenced to a period of 180 months on Count 1 and 180 months on Count 5, to be served concurrently, with credit for the time that you've already served. You are further sentenced to serve a term of supervised release for life on both Count 1 and Count 5. And that, let me be clear -- and this will be quite clear when you hear the conditions -- is a punishment too.

I will find that the defendant does not have the ability to pay a fine and, therefore, waives the imposition of a fine. You are required to pay a $100 special assessment on

each count, for a total of $200. It's immediately payable to the Clerk of the Court for the U.S. District Court for the District of Columbia. You can make payments on it while you're incarcerated through your participation in the Bureau of Prisons' Inmate Financial Responsibility Program. If you're released and it hasn't been paid, within 13 days of any change of address -- 30 days, you have to notify the Clerk of the Court of the change until such time as the financial obligation is paid.

It's also a condition of your sentence, since you've been convicted of two felony offenses, that you must submit to the collection and use of DNA identification information while you're incarcerated or at the direction of the U.S. Probation Office. And that will be a condition of your supervised release as well.

The sentence also includes an order of forfeiture. And you will be forfeiting all devices seized on May 16, 2024, including the Micron hard drive, the desktop computer, the Microsoft laptop, the Dell Latitude laptop, the four Apple iPhones, the two Samsung portable storage devices, and the Lenovo Thinkpad.

Within 72 hours of your release from custody you must report in person to the probation office in the district to which you are released. I will transfer supervision to the district in which you reside, but I'm not going to transfer

jurisdiction over this case to another court.

While you're on supervision you shall not possess a firearm or other dangerous weapon. You may not use or possess an illegal controlled substance, and you may not commit another federal, state, or local crime.

In your case, the mandatory conditions also include that you must make restitution, in accordance with 18 U.S. Code § 3663(a), as in an amount that will be determined at our next hearing.

It is also a mandatory condition of your supervised release that you must comply with the requirements of the Sex Offender Registration and Notification Act, 42 U.S. Code § 16901, as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in any location where you reside, work, are a student or were convicted of a qualifying offense.

You must also abide by the general conditions of supervision adopted by the U.S. Probation Office, as set out in paragraph 133, on pages 21 to 22 of the presentence report, so you've been on notice of them, as well as the following special conditions -- and I want to make it clear, the sex offender registration requirement is for the rest of your life. While you're on supervised release you must participate in drug testing, including random drug testing, to determine if you've used a prohibited substance. You must not attempt to obstruct

or temper with the testing methods. I'm going to order that you participate in a substance abuse treatment program and follow the rules and regulations of that program based on what the assessment reveals. The probation officer will supervise your participation in the program and it will determine -- actually -- all right, I have the testing.

You will also have to go through a substance abuse assessment and then any treatment program that the assessment recommends. The probation officer, it will be up to them, in their discretion, to then supervise your participation in the program, who the provider is, the location, the modality, the duration, the intensity, et cetera.

I'm also going to order that you participate in a mental health assessment and treatment under the supervision of the probation office. And you have to comply with all aspects of the treatment plan, including sessions with a qualified therapist in compliance with any medical regimen. And you have to sign any releases necessary to enable the probation office to monitor that compliance.

You must also participate in the sex offense-specific assessment. If you are able to do so, you must pay a percentage of the cost of that assessment at the discretion of the probation office. You must also participate in a sex offense-specific treatment program and follow the rules and regulations of that program as indicated by the assessment. It

will be up to the prohibition office to supervise your participation in the program. And, if possible, you must pay a percentage of the cost and program -- cost of that program as determined by the probation office.

You must submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure that you are complying -- in compliance with the requirements of your supervision or treatment program.

You will be permitted to use standard computer devices; desktops, laptop computers, smart phones, et cetera, with internet access, but you must permit the U.S. Probation Office to configure and manage and install monitoring software on all of your approved standard computer devices, even the ones that you are issued through work.

Your standard computer devices are limited to those that can be configured and managed and monitored by the probation office. And the configuration, management, and monitoring of the devices shall be specific to your court-ordered conditions, risks and needs in cyber crime management requirements.

You also -- you must submit your computers or other electronic communications or data storage devices or media, all as defined as 18 U.S. Code § 1030(e)(1), to searches under two different conditions: First, to ensure compliance with the computer monitoring conditions, you must allow the probation

officer to conduct initial and periodic unannounced searches of any computers as defined in the statute I just cited subject to computer monitoring, including the computers to which you have access as part of your employment. The searches are to be conducted to determine whether the computer contains any prohibited data prior to installation of the monitoring software, whether the monitoring software is functioning effectively after its installation, whether there have been any attempts to circumvent the monitoring software after its installation. And you must warn other people who use those computers that those computers may be subject to searches pursuant to this provision.

Second, if reasonable suspicion exists that there's been a violation of the condition of supervision and that the computer or device contains evidence of that violation, a probation officer may conduct a search of your computer. And this includes computers to which you have access as part of your employment. And you must warn any other people who use those computers or devices capable of accessing the internet that they may be subject to searches pursuant to this condition. Any search under this condition will be conducted at a reasonable time and in a reasonable manner.

You're also not going to be on social media anymore. You must seek the approval of the probation officer if you want to access, view or use any online social media. You must not

download any social media apps to your phone or computer. You must not access social media on any other device not approved by the probation officer, and that includes social media sites, chat services, blogs, instant messages, SMS, MMS, digital photos, video-sharing websites, email or other interactive online or electronic communication applications or sites. You're also specifically prohibited, as the victim requested, from using messaging services that delete messages. You're not going to be on Telegram or Snapchat or anything developed in the future that makes messages disappear.

Also, there are going to be contact restrictions. You must not have direct contact with any child you know or reasonably should know to be under the age of 18, including your own child, without the permission of the probation officer. If you do have direct contact with any child you know or should reasonably know to be under 18 without the probation officer, you must report the contact to the probation officer within 24 hours. Direct contact includes written communications, in-person communications, or physical contact. It does not includes incidental contact during ordinary daily activities in public places.

And you must not communicate or otherwise interact with Minor Victim-1, either directly or through someone else, without first obtaining the permission of the probation office.

Mr. Lawlor, are there any objections to the special

conditions?

MR. LAWLOR: No, Your Honor.

THE COURT: Pursuant to § 5D1.1 and 2 and 3, I hereby have to make the following findings and state the reasons for the imposition of the special conditions for the length of time that you're on supervised release, and for the imposition of supervised release at all.

All of this, first of all, has been agreed to by the defendant. The record and the presentence report are replete with the defendant's many mental health and substance abuse challenges and the utter absence of any treatment to date. The defendant himself has expressed a desire to engage in all of it, he knows he needs it. And given the complexity and entrenched nature of the overlapping and longstanding problems, it's going to take a considerable amount of time to ascertain whether the treatment has made a difference, and the risk of stopping too soon is unacceptable.

Given the online nature of the offense and the extreme harm caused by every transmission of the images and defendant's apparent ability to hide what he's doing from everybody around him, or at least their refusal to look at what they can see, the computer conditions and monitoring are essential to provide deterrence, protect the most members, and to protect the most vulnerable members of the community. For the same reasons I find, pursuant to the *Malenya* case, 736 F.3d

554, that the conditions are reasonably related to the factors set forth in 18 U.S. Code § 3553 and they involve no greater depravation of liberty than is reasonably necessary for the purposes identified in that section.

The probation office is ordered to release the presentence investigation report to all appropriate agencies in order to execute the sentence. Treatment agencies shall return them upon the defendant's completion or termination from treatment.

Mr. Seestedt, you have a right to appeal the sentence imposed by the Court if the period of imprisonment is longer than the statutory maximum or the sentence departed upward from the applicable sentencing guideline range, which it didn't. If you choose to appeal, you must file any appeal within 14 days after the court enters judgment. If you are unable to afford the cost of appeal, you may request permission from the Court to file an appeal without cost to you.

Miss Shinskie, I believe that there are charges in the indictment that at this point the government needs to move to dismiss.

MS. SHINSKIE: Yes, Your Honor. At this time the government moves to dismiss the remaining counts in the indictment, which are Counts 2, 3, and 4.

THE COURT: All right. That motion will be granted.

Now, I am going to write in the judgment and

commitment order that the defendant should be designated to a facility that has sex offender treatment, particularly residential sex offender treatment, if available, residential substance abuse treatment, and mental health treatment. And we generally recommend that people be as close to their home and their family as possible, but that's -- those are all difficult things to put on the same table and, so, I want to know, Mr. Lawlor, is there any place in particular that you would like me to ask?

MR. LAWSTON: I think all of the Court's concerns can be satisfied at FMC Devens. So I would ask the Court to designate Mr. Seestedt there, if, of course, it has the services that the Court just outlined.

THE COURT: All right. Well, I will make that recommendation. As you know, the ultimate determination is not up to me. But I believe that he strongly needs all of that assistance and that's one of the purposes of this sentence, is for him to get them.

We also need to set a date to return to finalize the restitution issue.

MR. LAWSTON: Can Mr. Seestedt sit down, Your Honor?

THE COURT: I'm sorry?

MR. LAWSTON: Can he sit down now?

THE COURT: Yes.

Have the parties -- have you talked about what would

be appropriate? Or not yet?

MR. LAWLOR: Your Honor, what we had hoped to do was work together and perhaps just submit something in writing in 45 days.

THE COURT: Okay.

MR. LAWLOR: And I guess my question is: Does the Court intend to keep the judgment open until that time, or will the judgment be issued and restitution be --

THE COURT: I think the way it works is that the sentence permits me to say for an amount to be determined later and then we add that. I think the judgment and commitment order gets signed in the meantime, but I'm not 100 percent sure. Do you know? I know you can determine it later, and I think that means the designation process and all that will move forward.

Why don't we set a date for the submission of the status report in 45 days. If, based on that, I can enter a restitution hearing at that point, I will do that. If we need to have a hearing, we'll set it at that time and set it as soon as possible.

Forty-five days from now brings us to when? Early August. So can we proffer something, say, by August 14th?

MR. LAWLOR: Yes, Your Honor.

MS. SHINSKIE: Yes, Your Honor.

THE COURT: All right. So I'll call for a status

report and defer the determination of the amount of restitution until I've had the opportunity to review that, and hopefully that will resolve the situation.

Is there anything I need to take up now on behalf of the government?

MS. SHINSKIE: No, Your Honor. Thank you.

THE COURT: Anything further, Mr. Lawlor, on behalf of the defendant?

MR. LAWLOR: No, Your Honor. Thank you.

THE COURT: All right. Thank you very much, everybody. We're adjourned.

* * *

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 31st day of July, 2026

/s/________________________________

Janice E. Dickman, CRR, CMR, CCR
Official Court Reporter
Room 6523
333 Constitution Avenue, N.W.
Washington, D.C. 20001